**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **THE POLOTE CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION FILE** |
| | ) | |
| **v.** | ) | **NO. _____** |
| | ) | |
| **GILBANE BUILDING COMPANY and** | ) | |
| **W.G. MILLS, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | **DEMAND FOR JURY TRIAL** |
| _____ | ) | |

## COMPLAINT

COMES NOW Plaintiff The Polote Corporation ("Polote") and files this Complaint against Defendants Gilbane Building Company ("Gilbane") and W.G. Mills, Inc. ("Mills"), stating as follows:

### PARTIES

1.      Polote is a citizen of the State of Georgia, being a Georgia corporation, with its principal place of business located in Savannah, Chatham County, Georgia.

2.      Gilbane is a citizen of the State of Rhode Island, being a Rhode Island corporation, with its principal place of business in Rhode Island.  Gilbane is registered to do business in the State of Georgia and can be served with

process at its Georgia registered agent, CT Corporation System, at 1201 Peachtree Street, Atlanta, Georgia 30361.

3.     Mills is a citizen of the State of Florida, being a Florida corporation, with its principal place of business in Sarasota, Florida.  Mills is a subsidiary of Gilbane and may be served with process on the Georgia Secretary of State or through personal service at its principal office in Florida.

### JURISDICTION AND VENUE

4.     Pursuant to 28 U.S.C. §§ 1331, 1332 and 1343(a), jurisdiction is proper in this Court.  The claims also arise under 42 U.S.C. § 1981.  Further, the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is an action between citizens of different states.

5.     Pursuant to 28 U.S.C. § 1391(a) and (c), venue is proper in this Court.

### FACTUAL BACKGROUND

6.     Polote is a licensed, African-American, general construction company, with its principal office in Savannah, Chatham County, Georgia, and which performs general construction, construction management, and program management services.

7.     On August 14, 2008, Polote entered a teaming agreement with Gilbane (the "Teaming Agreement") to pursue construction management at-risk

contracts and share profits for construction projects with the Savannah Chatham County Public School System ("SCCPSS").   The projects to be awarded by SCCPSS recommended maximum utilization of minority participation.   The Teaming Agreement was effectively a joint venture with regard to SCCPSS projects.

8.    The Teaming Agreement specified that both companies would "team together to prepare" proposals and "provide Construction Management/General Construction Services" for projects awarded by SCCPSS.

9.    The Teaming Agreement designated that "Gilbane will be the prime contractor for the performance of services . . . and Polote will perform certain services as a team member."

10.    The Teaming Agreement further states that "Polote will have a significant role that earns fees consistent with the percentage specified in Paragraph 15 of this Agreement."

11.    Paragraph 15 provided that for the first four percent of the construction management fee (the fee being a percentage of the total cost of the work), the fee would be shared seventy percent to Gilbane and thirty percent to Polote.   For fees in excess of four percent, the fee would be shared sixty-five percent to Gilbane and thirty-five percent to Polote.   Gilbane maintained the

responsibility and duty to pay Polote its appropriate share of fees, profits, compensation, and reimbursables on a quarterly basis.

12.     Paragraph 16 of the Teaming Agreement provides that "[n]either party shall perform other work on the Project(s) as an individual entity or as an association or partnership with another entity, unless the other party either chooses not to participate in performing the other work and/or has provided prior written consent."

13.     Further, Paragraph 12 of the Teaming Agreement required full cooperation of both parties that they would "not actively participate in any other efforts that are competitive with the team's efforts" or "compete independently for the award of the performance of [a] Project during the term of th[e] Agreement."

14.     Gilbane opened a local office located within Polote's principal office in Savannah.  Gilbane leased office space on the second floor of Polote's office so that Gilbane would have the same address and could use Polote's support staff and facilities.

15.     Pursuant to the Teaming Agreement, Gilbane was awarded, with Polote as a team member, the construction management contract for the SCCPSS Godley K-8 School.

16.    The Teaming Agreement was amended in April 2010, to expand the scope of the partnership to additional projects and additional locations.  The essential terms of the Teaming Agreement, sharing resources to respond to requests for proposals, making joint presentations, and sharing profits on awarded contracts, remained intact.

17.    During performance of the Godley K-8 School project, Polote became concerned Gilbane was not honoring its fiduciary obligations under the Teaming Agreement.  Specifically, Gilbane was not performing the proper accounting of reimbursable costs as well as fees payable to Polote, and communicated critical, racial, and unprofessional statements about Polote to SCCPSS, its agents, and to the local community.   Specifically, Gilbane communicated that Polote was making "way too much money for an MBE (minority business entity)."  Gilbane believed Polote's participation as an MBE team member was no longer essential to compete successfully for SCCPSS projects and Gilbane could receive fees that would otherwise be due Polote. Gilbane has failed, despite repeated requests, to provide an accurate accounting of the costs and fees associated with the Godley K-8 School project and has inflated costs by unnecessarily charging Gilbane personnel as a project cost.

18.     Polote proposed at a meeting in November 2009, it would be best for both parties to agree either to rehabilitate the relationship or develop a plan for each team member to procure work that the other team member does not want to pursue.  Specifically, Polote said the parties should continue as team members to respond to the SCCPSS proposals for Beach High School and Gadsden Elementary School (as well as the Liberty County project which was part of the amendment to the Teaming Agreement).  The planning and preparation of a proposal for Beach High School was already underway.  However, Polote suggested that it wanted to pursue the SCCPSS Pulaski Elementary School project since Gilbane did not want to participate in that project.  Gilbane did not object and agreed that Polote could pursue the Pulaski Elementary School project without Gilbane.

19.     For the next five months, the parties continued to perform the Godley K-8 project and Polote headed the effort to develop a proposal for the Beach High School project with local community input.  Beach High School is the historic African-American high school in Savannah.  Polote developed marketing and proposal materials using alumni information and support.  Polote also pursued the Pulaski project without Gilbane (the proposal was due May 6, 2010).

20.    As part of the preparation of a proposal for the Beach High School project, Gilbane requested on April 7, 2010 a meeting to "finalize strategy." Unknown to Polote, Gilbane was establishing another office location (other than Polote's office location) to pursue SCCPSS work without Polote.  In addition, Gilbane was soliciting other minority contractors in the Savannah area, such as MCN Construction, to replace Polote.  When questioned about this activity, Gilbane denied these efforts.

21.    Contrary to all prior agreements and discussions, Gilbane sent a letter dated April 15, 2010 purporting to jointly terminate the Teaming Agreement.  The parties were actively working on the proposal for Beach High School, which was due May 6, 2010 (in less than 30 days).  Polote reminded Gilbane of the earlier meeting in November 2009, and the decision to pursue, jointly and as team members, Beach High School and Gadsden Elementary School, and the agreement that Polote could pursue, without Gilbane, the Pulaski project.  Polote requested Gilbane reconsider its decision, especially in light of the impending deadline for Beach High School.

22.    Gilbane, however, without further communication, sent a letter dated April 17, 2010 purporting to terminate the Teaming Agreement.  Polote protested the untimely notice and the prejudice this action would have on Polote.

23.    Unknown to Polote, Gilbane and Mills entered an agreement whereby Gilbane acquired the stock of Mills.  This allowed Gilbane and Mills, although jointly owned, to submit separate proposals for Beach High School.

24.    Gilbane violated the express terms of the Teaming Agreement by purporting to terminate within 60 days of the due date of a proposal for Beach High School.

25.    Gilbane and Mills separately, and without Polote, presented and submitted proposals for Beach High School.   In violation of the Teaming Agreement, the Gilbane proposal including technical data and work product prepared by Polote.

26.    SCCPSS awarded the project to Mills on May 20, 2010, who submitted its proposal to SCCPSS with an unlicensed, minority contractor as its minority partner.

27.    On or around November 15, 2010, Gilbane, a $3.2 billion company, announced that it had acquired Mills, a $275 million general contractor.  This was the first time Polote became aware of the relationship between Gilbane and Mills.  The acquisition of Mills allows Gilbane to earn fees from Beach High School without having to pay Polote the percentage it would have earned under the Teaming Agreement.

28.     According to the information released to the public, Gilbane and Mills pursued projects jointly for twenty months prior to the announcement in November 2010.  Gilbane not only violated its fiduciary duties to Polote but may have violated the express terms of public solicitations and engaged in anti-competitive conduct (submitting separate proposals from a commonly owned business).

29.     But for the action of Gilbane and Mills, Polote would have performed the Beach High School project as a minority team member and received substantial fees from this $35 million construction project.

30.     Polote has been damaged by the agreement by Gilbane and Mills to pursue the Beach High School project without Polote and by Gilbane's wrongful termination of the Teaming Agreement.  The termination was racially motivated. Gilbane terminated the teaming arrangement because "Polote was making way too much money for an MBE."

31.     Gilbane believed it no longer needed a minority team member to compete for SCCPSS projects and could garner greater profits without having to pay a substantial percentage of the fees to Polote.  In addition, Gilbane and Mills could pursue other SCCPSS projects with an unlicensed minority contractor who shared a much smaller fee.

32.     Polote has been damaged by the acts of racial discrimination, and communication to SCCPSS, the industry, and the community of critical, racial, and unprofessional statements.

33.     Polote has also been damaged by the failure to properly bill and perform accurate accounting for the costs and the fees associated with Godley K-8 School.

34.     Polote has been damaged by the failure to disclose (and breach of the Teaming Agreement as well as breach of fiduciary duty) the relationship between Gilbane with Mills.

35.     All conditions precedent to this action and the grant of relief requested by Polote has been performed or has occurred or has been waived, satisfied or excused.

## COUNT ONE
### (Breach of Teaming Agreement)

36.     Polote incorporates by reference and realleges the allegations contained in Paragraphs 1 through 35, as if fully set forth herein.

37.     Under the Teaming Agreement, Gilbane agreed to jointly pursue contracts for construction with Polote, unless terminated at least 60 days prior to the due date of the proposal.

38.     Gilbane breached the Teaming Agreement by failing to provide Polote with at least 60 days notice prior to the due date for submitting a proposal for the Beach High School project prior to terminating the Agreement.

39.     The Teaming Agreement allows each member to pursue alone "Other Work" that the other member chooses not to pursue.  Polote was permitted, under the Teaming Agreement, to pursue the Pulaski project because Gilbane did not want to participate in that project.

40.     Polote is entitled to recover all direct damages as a result of Gilbane's breach of the Teaming Agreement.

41.     Polote's direct damages consist of reimbursable expenses, profit and reasonable overhead that Polote would have made from full performance by Gilbane, in excess of $1,000,000, plus any incidental damages.

## COUNT TWO
### (Breach of Fiduciary Duty and Accounting)

42.     Polote incorporates by reference and realleges the allegations contained in Paragraphs 1 through 35, as if fully set forth herein.

43.     As a partner and party to the Teaming Agreement, Gilbane owed a fiduciary duty to Polote.

44.     Gilbane breached that duty by placing its economic interest ahead of Polote, withholding significant and material information, failing to timely remit monthly accounting statements, and billing for Gilbane personnel that were no longer working on a project.  Further, Gilbane has repeatedly refused to provide accounting information for the Godley K-8 project since May, 2010.

45.     Specifically, Gilbane did not disclose it arranged different office space and was contacting other local minority business entities prior to its wrongful termination of the Teaming Agreement.

46.     As a direct and proximate result of Gilbane's breach of its fiduciary duty, Polote has suffered damages in an amount to be proven at trial.

## COUNT THREE
### (Fraudulent Misrepresentation)

47.     Polote incorporates by reference and realleges the allegations contained in Paragraphs 1 through 35, as if fully set forth herein.

48.     Gilbane represented that it would not actively participate in any other efforts that were competitive with the projects within the scope of the Teaming Agreement.  The only exception was if the other team member did not want to participate, such as the case with the Pulaski project, in which case the Teaming Agreement permitted one team member to pursue that other work.

49.    At the time Gilbane wrongfully breached the Teaming Agreement, Gilbane knew that it was conducting activities that would allow it to purchase Mills and wrongfully exclude Polote from SCCPSS projects.

50.    Gilbane intentionally and purposefully made representations that it was pursuing the Beach High School project less than thirty (30) days before the proposal was due.

51.    Polote relied on the Gilbane representations.

52.    Polote suffered loss and damage, in excess of $1,000,000, as the proximate result of the Gilbane representation.

53.    Gilbane's specific intent to cause harm to Polote entitles Polote to recover punitive damages from Gilbane, pursuant to O.C.G.A. § 51-12-5.1.

COUNT FOUR

(Punitive Damages)

54.    Polote incorporates by reference and realleges the allegations contained in Paragraphs 1 through 35, as if fully set forth herein.

55.    Gilbane's actions have shown the willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

56.     Under these circumstances, an award of punitive damages is authorized pursuant to 42 U.S.C. § 1981 and O.C.G.A. § 51-12-5.1.

## COUNT FIVE
### (Interference with Contractual Relations)

57.     Polote incorporates by reference and realleges the allegations contained in Paragraphs 1 through 35, as if fully set forth herein.

58.     Polote had a contractual relationship with Gilbane based on the Teaming Agreement. Mills was a stranger to the contractual relationship between Polote and Gilbane.

59.     The pursuit of the SCCPSS contracts was the foundation of Polote's and Gilbane's contractual relationship.   Mills was competing for the same SCCPSS projects.  Acquisition discussions between Mills and Gilbane occurred while the Teaming Agreement was still in effect.   Therefore, Mills knew or should have known that a contractual relationship existed between Polote and Gilbane.

60.     Mills intentionally interfered with Polote's contractual relationship with Gilbane.   Mills (1) acted improperly and without privilege; (2) acted purposefully and maliciously with the intent to injure; (3) induced Gilbane to terminate the Teaming Agreement; and (4) caused financial injury to Polote.

61.     Because Gilbane acquired Mills, Gilbane was effectively awarded the Beach High School project. Mills' inducement of Gilbane to breach the Teaming Agreement excluded Polote from the Beach High School project.

62.     Mills' interference with Polote's contractual relationship with Gilbane was without legal justification or excuse.

63.     Polote suffered financial injury as a result of the misconduct of Mills that interfered with Polote's contractual relationship with Gilbane.

## COUNT SIX
### (Discrimination in Contractual Relations)

64.     Polote incorporates by reference and realleges the allegations contained in Paragraphs 1 through 35, as if fully set forth herein.

65.     Gilbane's and Mills' acts of racial discrimination were willful, malicious, intentional, in bad faith, and in reckless disregard to Polote's rights.

66.     Gilbane's and Mills' racial animus has interfered with Polote's ability to enjoy all of the benefits, privileges, terms, and conditions of the Teaming Agreement.

67.     Further, comments made by Gilbane and Mills pertaining to Polote's race have jeopardized Polote's current business relationships.  For example, Gilbane has recently warned other potential team members that they should

avoid teaming with an African-American contractor such as Polote for SCCPSS projects.

68.     Polote is entitled to recover compensatory and punitive damages as a result of Gilbane's and Mills' violations of Polote's rights under 42 U.S.C. § 1981.

## COUNT SEVEN

### (Violation of § 1 of the Sherman Antitrust Act)

69.     Polote incorporates by reference and realleges the allegations contained in Paragraphs 1 through 35, as if fully set forth herein.

70.     Upon information and belief, Mills and Gilbane began negotiating the merger of their respective companies 20 months before the merger closed.  At that time Mills and Gilbane also began pursuing projects jointly.   The negotiations occurred, and due diligence was performed, while Mills and Gilbane were directly competing for SCCPSS projects.

71.     The award process for the SCCPSS projects called for submission of proposals from interested companies.   Finalists were then chosen from the submissions, which were then interviewed and scored.  Gilbane and Mills each submitted competitive proposals and were selected as finalists.   Without

disclosure, the least competitive proposal was withdrawn, to the disadvantage of the SCCPSS and the other bidders.

72.     The Defendants entered into a collusive contract, combination, and/or conspiracy to restrain trade and commerce, the purpose and effect of which was to exchange information and unreasonably reduce the competition for SCCPSS projects.

73.     The acts done by each of the Defendants as part of, and in furtherance of, their collusion was authorized, ordered, or done by their officers, agents, employees, affiliates, owners, or representatives while actively managing the Defendants.

74.     The Defendants' acts constitute an unreasonable restrain on competition, the net effect of which is anticompetitive.

75.     The Defendants' unlawful conduct substantially and adversely affects interstate commerce in the relevant markets and submarkets.

76.     Defendants' anticompetitive behavior has directly and proximately harmed Polote because Polote participated in the competition for SCCPSS projects and did not receive fair consideration because of the multiple proposals submitted by the Defendants.

COUNT EIGHT

(Attorneys' Fees)

77.    Polote incorporates by reference and realleges the allegations contained in Paragraphs 1 through 35, as if fully set forth herein.

78.    Gilbane and Mills have acted in bad faith causing Polote unnecessary trouble and forcing it to incur expenses in bringing this action.

79.    Polote is entitled to attorneys' fees and costs in accordance with 42 U.S.C. § 1988(b) and O.C.G.A. § 13-6-11.

PRAYER FOR RELIEF

WHEREFORE, The Polote Corporation respectfully prays for a judgment against Gilbane Building Company and W.G. Mills, Inc., in an amount in excess of $1,000,000, attorneys' fees and expenses of litigation, and for such other and further relief that this Court deems just and equitable.

Respectfully submitted, this __4th__ day of May, 2011.

/s/  **Ronald G. Robey**
Ronald G. Robey
Georgia Bar No. 609850
Attorney for Plaintiff The Polote
Corporation
Smith, Currie & Hancock LLP
245 Peachtree Center Avenue, N.E.
Suite 2700 Marquis One Tower

- 18 -

Atlanta, Georgia   30303-1227
Telephone:   404-521-3800
Facsimile:   404-688-0671
Email:        rgrobey@smithcurrie.com

## DEMAND FOR JURY TRIAL

The Polote Corporation hereby demands trial by jury on all claims stated

in this Complaint, as may be triable to a jury.

This ___4th___ day May, 2011.

/s/ **Ronald G. Robey**
Ronald G. Robey
Georgia Bar No. 609850
Attorney for Plaintiff The Polote
Corporation
Smith, Currie & Hancock LLP
245 Peachtree Center Avenue, N.E.
Suite 2700 Marquis One Tower
Atlanta, Georgia   30303-1227
Telephone:   404-521-3800
Facsimile:   404-688-0671
Email:          rgrobey@smithcurrie.com